Council, you may proceed. Good morning, and may it please the Court, my name is Dale Bohm and I am counsel representing Cy Ervine and the estate of Charlene Ervine in this matter. Before the Court today are two issues, well there are several issues, but they can be grouped into two main issues, and those issues are whether or not the logbook presented by the Nevada Deaf Advocacy Center is or is not hearsay, and whether or not Mr. Ervine is a proper plaintiff in this matter, and I think if we can get to those, the other two will take care of themselves. With respect to the standing issue, which I gather is your second issue, what is the injury in fact that you rely on the policies and practices of both the hospital and Dr. Canterroy in continuing to have procedures and policies in place that refuse or deny sign language? Did he make any showing that he was planning to go to that hospital and to see that doctor? Mr. Ervine lives in Kurump, Nevada, which is an incredibly small town. He lives in a town the size of a postage stamp, and as far as the hospital is concerned, it is the emergency services in the area. He has been lucky enough not to break his leg, have a heart attack or stroke or fall down. And that's enough to establish standing? If he is going, if he, within some future time frame, if he was injured, this is the place that he would be taken, and he would be subject to the policies and practices of the hospital for him to be taken there. You have to make a showing of standing. There's only two references in the deposition, and they're very, more on the vague side, they're not very definitive. And it seems like you're asking us to take judicial notice of the size and town of Kurump to establish Article III standing and the number of hospitals there or lack thereof and the number of general practitioners accepting Medicare. And I guess what's your authority or is there authority that we can take judicial notice of these facts that would then possibly give him standing? I don't know if that's even enough, but how do we even get to your arguments there? If I may, Your Honor, I would put it this way. If this was a question of a wheelchair ramp, if this hospital or the doctor's office were built without a wheelchair ramp, and the argument would then be your client has never used a wheelchair ramp, you would say we have no evidence of him ever going in. Well, it wasn't possible for him to go in, because he couldn't access the hospital in and of itself. I think you would more clearly take judicial notice that the reason he hadn't used the services is because the physical access to the hospital. Well, there would probably be something in the record saying that there's no wheelchair ramp and that, you know, some affidavit or something to support that. What specific facts in the record here, specific facts, demonstrate that Mr. Irvine is currently deterred from seeking medical care from either Dr. Tannery or Desert View, or intends to seek medical care from either of these two in the future? Is Dr. Tannery still in practice there? Dr. Tannery is still in practice in the town. The hospital is still open and ready for business. As I said, it is the emergency provider. Dr. Tannery is one of the few medical providers in town that accept the Medicare that he would have to pay through. His ability to seek medical care is supremely and extremely limited to the confines of the area. He doesn't have the transportation. In order to get the same amount of care, he would have to travel well over 70 miles. He would have to travel into Las Vegas or even out of State to get that. Is that in the record somewhere? That goes back to my judicial notice. You're asking us to take, I think, judicial notice, because you make these references in your brief, but, you know, we don't – can we take judicial notice of those? I believe that you can take judicial notice of the physical facts. Based on what authority? Do you have a case? I will freely admit that I – Your Honor, that I do not have a case to support that simply because I believe that it was self-evident because of the placement of the town geographically on the map. Let me ask this. What allegations in the amended complaint establish Article III standing? Can you point to anything in the amended complaint? That establishes his own standing? His standing. During the depositions he was asked very specifically, would you – The question is about the amended complaint. Is there anything in the amended complaint? I don't believe that the amended complaint was amended to include any of that information. I don't think that was submitted. Standing was never even raised in the lower courts, was it? It was not. And you had no opportunity to put in any evidence or affidavits to – if that was contested? It was not raised in the lower court, Your Honor. Thank you. That is true. The opportunity for the discussion of standing was preempted by the question of whether or not the logbook was hearsay. Let me ask you, which discrete discriminatory acts occurred within the limitations period? That is the question. They are referred to generally, and I just want to know what discrete – If I can somewhat turn that around and say that is the question that I think the lower court would have had to have addressed, which they did not. The logbook, when the lower court found that the logbook wasn't – was accepted from the rule by my client adopting it, which we also say he did not do. But whether or not it is or is not hearsay, it's our position that that doesn't matter because the lower court never analyzed the logbook to find out what discrete actions started the clock. When did the time start for the statute of limitations? It simply said the logbook starts on April 8th, therefore April 8th is when we start the clock. But that's not enough within the Americans with Disabilities Act because there is no common connected violation that happened on that date in order to start the clock. Were there discriminatory acts after that? Yes, absolutely. The discriminatory act that we say started the clock was when, for Dr. Canroy, was when one of his employees stated, Dr. Canroy has told me to tell you that he will not provide an interpreter at any time. That was November 12th, 2008, is that correct? Yes, that was within the time frame. I assume you were relying on the statute starting to run on September 1, 2008, is that correct? Yes. Now what's your response to the challenge that no, the statute actually ran with respect to the very first contact? The Americans with Disabilities Act separates out what is an injury for people who are deaf from other people with disabilities. If it was, as I said, a person using a wheelchair, the ramp is either there or it is not. It's very easy to determine this discrete event. And in Long Beach Coast Resorts, the Ninth Circuit said that if your building looks like A, you must have, according to the Americans with Disabilities Act Architectural Guide, a ramp that looks like this. It gives rise, it gives run, it gives measurements, all of these things saying if A then B. The same doesn't exist within the law for a person who is deaf. It's ambiguous at best. And so the determination of saying I didn't provide an interpreter isn't in and of itself a violation because the Americans with Disabilities Act doesn't guarantee an interpreter. It guarantees effective communication. And so there has to be some sort of analysis done by the court, which there was not here, on was effective communication denied. We are saying that there are two ways that you can analyze it. Number one, a pattern of practice of denying such an accommodation to say no matter what happens, we will not provide you with an interpreter. That is a violation because you're taking out from the list that's contained within the law one specific accommodation that it says would be used and you're saying, but we won't do that even though the law says that that's within the bounds. Or if you have evidence of an ongoing policy or practice. As far as the hospital is concerned, the hospital has to this date that I know of, no plan in place for securing an interpreter. They claim in the record that they called an interpreter twice. But that interpreter never came. Simply making the phone call, that's like saying we called to get the cement truck here to build the ramp, but they never showed up so we don't have a ramp so it's not our fault. It's not the calling, it's securing the interpreter. Having a means in place of getting the interpreter there, getting the accommodation done. That's the issue. And once we have it in place, and if you look at the record, there are several instances over time where they did not do it. The hospital says that the clock started to run two years prior when Charlene and Cy went into the emergency room. But whether or not on that one discreet occasion they were provided with an interpreter isn't the issue. The issue is whether or not they were provided effective communication and they knew or should have known. They asked Cy during the deposition, did you know that it was wrong? And he said, yes, of course it was wrong. Well, of course he's going to say that. But was it a violation? There's no evidence in here that there was a predicate violation with his feelings that it was wrong. Of course he's going to say it was wrong. He wanted an interpreter. But was he in fact suffering a violation? You allege in your complaint that Charlene's inability to communicate lasted until November 2009, I believe. Until she passed away. Yes. Yes. But once again, as far as Dr. Caneroy is concerned, she and Dr. Caneroy had a written agreement. The definition of effective communication, and here's the rub, within the Americans with Disabilities Act, what is and is not effective communication is not defined. It's a negotiation. It's a factual discussion between the parties. So saying that there's no matter of law, this is effective and this is not. What it says is you have to choose from this list of provided auxiliary aids and services. We're saying that Dr. Caneroy at one point said specifically, I will not use one of the things on this list. And on the hospital side, they had no means or mechanisms of securing an interpreter. They had a phone number that said death and then a phone number, but their head of risk management had no idea what happened when he called the phone number. There was no means. They have no means established of even providing these accommodations if they were required to. Counsel, what's your specific response to Judge Mahan's second order, the one that is under appeal here, granting the summary judgment based on the claim, the fact that the claims are time barred. That was his condition. What is your direct response to that? My direct response to that is he never identifies when the time starts. And he says it simply starts with the first date. But the first date doesn't come associated with any actual violation. He doesn't analyze the rest of the document to find out when, when he says it's time barred, when does that time start? What predicate event in here was the actual start? He just says the first date in the logbook. But the first date in the logbook doesn't actually document any specific violation. So nowhere in his analysis is there any specific predicate event that says this was the violation that they knew or should have known occurred and from that time on the logbook, the time starts. There has to be a factual analysis. And my answer is this. Once again, he's analyzing this as if we're talking about a ramp. He's analyzing it as if on April 8th the ramp either was or was not there. But the fact of the matter is it's not a structural issue. Interpreters can be there one time and gone another time. It's a matter of what is the policy practice procedure for securing those auxiliary agency services. Well, presumably the very first contact would have raised the question of providing an interpreter. Now, whether it was specifically asked for and specifically denied may be another issue. Absolutely. But they would have raised that question. But once again, if it was specifically denied, any one denial of an interpreter may or may not be a violation. The question is not whether you got an interpreter. The question is whether or not you got effective communication. And in the place of Dr. Kenroy, at that time, he and Charlene had an agreement that said, we will communicate in writing unless and until these specific conditions are met. We look through, if you analyze the logbook, at the time those conditions were met, they were met within the time frame of the statute of limitations, within the allowable time, so it wouldn't be time barred. But he failed to provide an interpreter when those conditions arose. Counsel, you're down to about a minute. I would like to reserve for rebuttal. You may reserve. Thank you. We'll hear from the hospital or the medical center, I should say. Counsel, come before the microphone, please. John Cotton, representing Dr. Kenroy. Mr. Cotton. Thank you, Your Honor. I'm going to start with the injunctive relief request that the plaintiff has here. Obviously, as to the estate of Mrs. Irvine, there isn't an appropriate claim that can be made on behalf of the estate for the injunctive relief. As to Mr. Irvine in his standing, there is no reasonable grounds to believe he's about to be subjected to any discrimination. He never sought any personal care from Dr. Kenroy. And the practical matter is, and this came out. You didn't raise this earlier, though, did you? You didn't give him a chance to address what his needs would be in the district court, did you? I think it's indirectly raised in the district court. But the practical matter is this Court has ruled that standing is never waived, that whether or not the Court has subject matter jurisdiction. No, it's not waived, but you still, people have a right to put in evidence of standing if there's some issue raised or supplement the record. I think practically speaking, we've raised the issue that he was never a patient. It was in the depositions. It was in the pleadings that were filed with the Court in both of the various motions. But the practical reality, and this is the key to this issue, I think, is that Dr. Tenuri doesn't operate George's Tenuri DBA Specialty Medical any longer. And the plaintiffs have known that since they took his deposition back in 2011. They had an opportunity to amend, but they were advised at that point of the deposition that he had sold his business to Health Plan of Nevada HPN and that he was an employee of Health Plan of Nevada HPN. He doesn't control, in his deposition he stated, he doesn't control their policies and procedures. So, Mr. George. But that wasn't briefed either before. I mean, if that's, that has to be dealt with again as a matter of factual issue. I mean, that wasn't, I don't think that was raised in the summary judgment motion. It wasn't briefed at all. Isn't that a fair statement? I think they've got the burden of showing they have standing, Your Honor. We don't. The practical matter is we don't waive standing. We can raise it at any level of the judicial process. But that doesn't go to standing, whether he still owns it, does it? I mean, how is that, that's a different issue than the standing. As to whether he's got standing to sue somebody for injunctive relief who doesn't own a business that he plans to attend, I think it does have to do with whether he has a proper standing to bring the claim, Your Honor. So you're arguing, based on Dr. Tannery, that because he doesn't have, because an estate, you're saying, does not have the ability to bring injunctive relief, there's no standing. You can't injunctive. You're not talking about Desert View. No. I'm going to leave that to Mr. Stryker. Okay. Yes. That's nice. Incidentally, how do you and Mr. Stryker plan to share your time? You're down to 12 minutes out of 15. Right. At about the seven and a half minute point, I will refer to Mr. Stryker at that point so that he has a full opportunity for his client. So our position is that there isn't any discriminatory, future discrimination that could occur from Dr. Tannery because we'd be assuming that HPN would be adopting policies and procedures that would be violative of the United States statute. I don't think that the Court takes that sort of an assumption in any setting. The practical assumption, and we even get it in jury instructions, is that a party has a right to rely upon another party performing their legal conduct appropriately. We have no basis other than for this Court to determine that whoever owns these facilities we're talking about now would comply with ADA, would comply with the other acts, and that he doesn't have any kind of a future claim to be made at this point. In terms of the balance of the case, I feel like I'm operating in parallel universes here. I've got what was alleged in the complaint by the plaintiff and by his counsel, and I have the depositions and discovery that took place, and then I've got a whole different argument on appeal. The practical matter is they pled very specifically in their complaint, amended complaint, paragraph 24, in April 2008, Mr. Irvine and Mrs. Irvine enlisted the help of the Nevada Deaf and Hard of Hearing Advocacy Resource Center to help them explain the need for an interpreter to all named defendants. That would include my client and Mr. Stryker's client. They also went on to state in their amended complaint that the only thing that would work for them would be an interpreter. That was what they needed in order to comply with these acts. Now, they can't take those back now on appeal and say those weren't our allegations, those weren't our complaints. But doesn't each time the Irvines were denied interpreter and were consequently unable to effectively communicate, start a new clock? I don't think it starts a new clock. That's a continuum of conduct is what it would be. And when he says the judge didn't have any start date on this, the minimal start date he would have from Exhibit 5 to the various complaints, it's page 2828 of the record, is April 4, 2008. That very specific day she complained an informant or doctor refused to provide her a sign language interpreter. It looks like there's a Supreme Court case. It's National Railroad Passenger Corporation versus Morgan. National Railroad Passenger Corporation. Yes. Versus Morgan. It says that Morgan applies equally to the Rehabilitation Act and other civil laws. And it says each discriminatory act starts a new clock for filing charges alleging that act. So how do you address that? If you are taking on the position that you're starting a new clock every time, then every time up until approximately November of 2008. Of 2009. Of 2009. Every one of those dates had run by the time they filed the complaint. The practical matter, if you're taking them individually, if you take them in the aggregate as an act of failing to provide a sign language interpreter, that's one course of conduct that they've engaged in. Well, the complaint was filed in September of 2010, right? Yes, sir. So you go back two years from that. Anything that happened between September 1st, 2008 and anything between 2010 is not barred by any statutes. Isn't that a fair statement? If you take – if there's separate requests every time for them to come in under the Supreme Court case we're referring to here, if they specifically said each time, but they didn't because they had a written agreement that the sedent plaintiff had signed off on, if you take the position that they've turned them down on a sign language interpreter but she's conceded that that's okay, which she did in that document, then the only time that you're going to get into that situation is way down the line when you're down to where they're saying, well, now all of a sudden the plaintiff's counsel want to say that's not good enough. Well, now, what happened on November 12th, 2008? November 12th, 2008? You heard my colloquy with your opposing counsel. Let me pull my timeline up here. That was, as I understand it, your client's declining to provide an interpreter. Right. And that specifically occurred within the statutory time. Right. Within the statutory time. But the problem that they've got in this case is this isn't just a fact determination. Whether or not to deflect, if you will, away from the written agreement that they had with Mrs. Irvine and Mr. Irvine that they would have handwritten communication back and forth. Whether or not it was appropriate to defer from that at that point in time isn't a matter of lay knowledge. It's a matter of expert testimony. Whether or not continued handwriting was adequate when you have a complainant like that saying that, well, now I want to switch to a sign language interpreter. The plaintiffs have the burden of showing that somehow or another that didn't comply. I don't believe that that is a subject of lay testimony and the practical matter is that it is not. It is clearly something that has to do with medical care, appropriate to some medical care, and you can't take that out of the act and exclude that. And I guess, Your Honor, with my time up. Very well, Counsel. Appreciate it, Court. May it please the Court. Your Honors, my name is Eric Stryker on behalf of Respondent Desert View Regional Medical Center. And I want to stress the name of my client, Desert View Regional Medical Center, because what I had been hearing and what my client had been hearing in the lower court and on appeal are incidences of alleged denials of interpreter services alleged against Desert View Regional Medical Center, a rural hospital in the small town of Burrum. But the facts and the alleged evidence supporting those facts relate to entirely different things. Take an example. In the lower court, in opposition to the motion for summary judgment filed by co-defendant Dr. Tonori, plaintiffs argued at length regarding a systemic policy of discrimination, an ongoing corporate policy that was established over the course of repeated contacts and detailed in the logbooks of the DHHARC, Deaf and Hard of Hearing Advocacy Resource Center, and specifically culminating on, I believe, an April of 2008 decision by office manager Brenda that sign language interpreters would be denied and a reformation of the agreement that the patient would agree to cooperate with written communication. That never happened at Desert View Regional Medical Center. That happened at co-defendant Specialty Medical Center, which is now a non-party. It's been dismissed. So even on appeal, I'm concerned that plaintiff argues in the appellate brief that this ongoing corporate policy of systemic violations of requesting interpreters, being denied interpreters, the advocacy groups call the medical practice, they're put on hold for ten minutes and then hung up. They call repeatedly the diversion tactics. None of that happened at my client, Desert View Regional Medical Center. I've been trying very hard to try to ascertain the discreet acts or the individual acts of denial of sign language interpreters, and it's like battling a ghost. It's like shadow boxing a phantom. Where do these acts occur to the extent that we know from the record? I'm trying to find out. What I can tell you is this. Any allegations regarding an ongoing systemic violation of denial of interpreters at Specialty Medical Center has absolutely nothing to do with my client, Rural Hospital Desert View. So the whole conversation regarding Brenda and the death and hard of hearing advocacy logbooks, the logbooks show no denial of an interpreter at Desert View. They show a request for an interpreter made to the advocacy group to go to an appointment at Desert View, but there's no reference whatsoever in the logbooks of any denial of an interpreter at Desert View. There is a vague reference to a denial by somebody named Sally at the hospital. Plaintiff's counsel inserts in parentheses the words Desert View to imply to this court and the lower court that that denial took place at Desert View. There's no evidence that that denial took place at Desert View. Quite frankly, there's no evidence that there was ever a sleep study done during that month that it was alleged.  The issue that you're raising now, was that in your summary judgment motion? It was in my joinder to the motion for summary judgment. It was also in my joinder to the codefendant's motion for reconsideration and reply in support of same. And I highlighted the fact that I felt it was improper in the lower court for the record to be distorted in the manner that it was by asserting that this rejection of an interpreter by Sally at the hospital was really a rejection by Desert View Regional because the logbook entry itself doesn't say Desert View Regional Hospital. There's another, to be fair to plaintiff's counsel, there's another claim violation which was presented to the lower court and was also presented on appeal. That other violation arguably took place within the two-year statute of limitations of the filing of the complaint in 2009, August of 2009. But what plaintiffs rely on, and this is addressed largely at page 14 of their reply brief on appeal, is that Desert View Regional Medical Center denied an interpreter as part of a corporate policy through Dr. Wu, Dr. W-U, Dr. Wu. Dr. Wu is a general surgeon in Pahrump. Plaintiff's deposition testimony made perfectly clear, and this was expressed to the lower court, that Dr. Wu's denial of a sign language interpreter never took place inside my client, Desert View Regional Medical Center. Instead, to the contrary, Dr. Wu's office, according to plaintiff's own sworn testimony, was located in a trailer adjacent to Desert View Regional Medical Center and that he admits he was not inside Desert View. Now that tells me, and it told the lower court, I believe, which is why they granted the North Shore Summary Judgment, that Cy Irvine and Charlene Irvine, in August of 2009, when they presented to Dr. Wu, were not denied a sign language interpreter by Desert View Regional Medical Center, my client. Instead, at best, if true, they may have been denied a sign language interpreter by a non-party general surgeon who maintains an office in a trailer, quote-unquote, adjacent to the hospital. What is Dr. Wu's relationship to the hospital? Independent contractor, Your Honor. He's a general surgeon. He treats patients at our facilities, holding staff privileges. Questions to that effect were posed to the risk manager of Desert View Regional Medical Center, Janet Pinner. By the way, just as an aside, there's a footnote referencing my disagreement with submission of the entire Pinner deposition on appeal. The reason why is because I only attached one page of Nurse Pinner's deposition to the lower court. The lower court never had the opportunity to review the entire transcript of Ms. Janet Pinner, and that's why I objected and pointed out that it was improper to submit it to this court now. Let me ask you a couple of questions. What happened to the state claims? I'm looking. I can't figure out what happened to the state claims. They were just, I mean, did they go back to the state? What authority did the court, did he resolve them? It's a very good question, Your Honor. And it's one that I don't have a very great answer for. I can tell you that the order is somewhat vague as to what happened to the state claims. What I can tell you, though, is that the motion for summary judgment filed by co-defendant Dr. Tenorio requested dismissal of all claims, and we joined that request for dismissal of all claims. And the order essentially dismissed the case. There was no, I believe from memory, specific direction as to whether or not those state claims should be remanded or not. I apologize. I just don't know what the judge intended to do, but I believe and would submit that the intention was to dismiss the case in its entirety for the same reasons as the dismissal of the ADA claims and the 504 claims. How did the reasons for the ADA support the dismissal of the? You know, the applicable statute of limitations for the ADA claims would be the personal entry statute in the State of Nevada, two years. That same statute of limitations, I feel, would apply to torts or personal entry claims of intentional inflection of emotional distress or negligent inflection of emotional distress. So I think the statute of limitations argument applies whether it's an ADA 504 claim or whether it's a state inflection of emotional distress claim. But I agree it's somewhat vague in the order as to what the court truly intended. But I would submit that a global dismissal was intended by the lower court. I know you're out of time, but I allowed you to, I wanted you to talk about your case and how Desert View was not involved. But I did want you to respond to the standing, if you could, and what's your response to the questions that we've been asking on whether or not just the past conduct is enough for the appellant here to have standing against Desert View or not. I think the questions are very good. I took notes and I made some circles of things I would very much like to respond to. With regard to Plaintiff Sy Irvine, the standing argument would simply be that under the case law, we were established and standing can be raised at any time. Granted, it may not have been raised at the lower court, but it can be raised at any time. It was raised and the plaintiffs were given an opportunity to refute it in the reply briefs when we did raise it on appeal. But as to Sy Irvine, he was never a patient of Desert View Regional Medical Center, just like he was never a patient of co-defendant Dr. Tannouri's practice. Further, as the court pointed out in questioning opposing counsel, there's no imminent or even real potential of him going to Desert View Regional Medical Center. Plaintiff's counsel stated that it was one of the few medical providers in the town. Few does not mean the only medical provider in the town. The mere speculative possibility that he could have a heart attack, have a motor vehicle accident, and therefore be transported to my client hospital is remote. It does not meet the standard that the courts impose of an actual and real imminent threatened danger of continuing harm. What about opposing counsel's argument that, in effect, we could take judicial notice of the fact that you're the only hospital within any reasonable range? Well, you know, maybe the only rural hospital in reasonable range. There's also quick care centers. And quite frankly, if the hospital is crowded, ambulances commonly divert to Las Vegas, which is just over the hill. So, you know, I think that, to add to that, quite frankly, that plaintiffs themselves chose to seek care in Las Vegas, greater Las Vegas, because they prefer to. So they've even demonstrated preference to no longer even seek treatment in Pahrump. They prefer to go to Las Vegas because it's not that far of a drive. Further, you know, there's a couple of things that were said by opposing counsel I want to hit briefly. Opposing counsel argued the ADA separates out injuries to deaf persons from non-deaf persons and gave the example of a ramp, a physical barrier. Respectfully, I haven't seen any case law supporting the allegation that deaf persons are treated any different than non-deaf persons under the ADA. Opposing counsel criticized the hospital because there was no plan in place, that they called the hospital, that they called an interpreter, but they didn't guarantee an interpreter would get to the bedside. Respectfully, I don't think the ADA requires that. I don't think my client is required to jump in a pickup truck, drive into the nearby town, and force an interpreter to the hospital. Thank you, counsel. You're way over time. Thank you. Thank you, Your Honor. Mr. Boehm, you have one minute reserved and we gave the other side four minutes in addition, so you have five minutes and 12 seconds. Thank you. May it please the Court. My first question is what authority do you have that an estate can bring a claim for injunctive relief? I'm sorry, Your Honor. What authority is there that you can highlight that an estate can bring a claim for injunctive relief? An estate? An estate. Oh, an estate can bring a claim for injunctive relief. Your Honor, the injunctive relief is, and we addressed this in our brief, is cited for Cy Irvine only. The Charlie Irvine is attached to this only under the 504 claims. Which is a claim for monetary damage. So the injunctive relief question is under Cy Irvine. Well, you can see that she cannot make a claim under the ADA for injunctive relief. Absolutely. That wouldn't survive. That is, her estate cannot. Okay. That wouldn't survive. Very well. Thank you. Not a problem. I completely agree with Mr. Cotton that there are issues that need to be resolved through factual discussion that this needs to be remanded back to the district court. The last argument he made. I don't think he was calling for a remand. I don't think he was calling for a remand. But he did say that his argument would need to be addressed under a factual discussion. We're talking as a matter of law. I didn't make a good enough note on that. I will move on from it. If I can go back to the argument about Desert View and saying that none of these occurred at Desert View. Desert View, as they said, claimed that they made a call for an interpreter twice and no interpreter showed up. No, I don't think they need to hop into a pickup truck and go and get an interpreter. But they do need to have a system set up where they know that when they call an interpreter, they have an agency that they're working with. Are you talking about the medical center or the doctor? I'm talking about the medical center. What facts support that these incidents occurred at Desert View and that Desert View should be held accountable for this? There are at least two that Desert View admits to. They say at least twice that they called for an interpreter but no interpreter showed up and they didn't have an interpreter. When were those? What was the date of those? I'm terribly sorry. The dates are in Ms. Penner's, the documents that were submitted under Ms. Penner's deposition. And I don't have those in front of me. I'm taking the time to go and dig them out because I was coming up under the less than one minute idea. I apologize. But they are in there. But I guess there's just a forceful argument has just been made that Desert View didn't have anything to do with this. What is your response to that? Desert View is the regional medical center. And they try to separate themselves from Dr. Wu. But once again, they said, Dr. Wu has privileges. He's in our hospital. The question here would go towards... So you're relying on Dr. Wu's conduct to implicate the Desert View. Is that correct? If I wanted to request a sign language interpreter, this is the question. If I was requesting a sign language interpreter, I was going to a USANA or an Amway or a convention for a multi-level marketing, let's say. And they're having this convention at a convention center. Who is responsible for providing the accommodations? Well, the people who rent the convention center are not responsible for providing ramps. They're certainly not responsible for making sure that the convention center is accessible. There is an idea that the place, the hospital in and of itself, is a brick and mortar building. The people are the ones who are responsible for making up the accommodations. And so separating out Dr. Wu, if they're going to claim him on their wall and say, Dr. Wu has an office here on campus of our hospital, making the sign language interpreter should be through the hospital. They're the ones who otherwise the deaf person would have to resort to asking individually each and every person, every nurse they see, what's the proper person to ask, what's the proper person to ask. They have no centralized plan for doing this. Well, you might have a claim against Dr. Wu, but not necessarily against the medical center. Doesn't that make sense? If Dr. Wu is advertising himself as a doctor working with the medical  All right. We understand your argument, counsel. Once again, we say when we can show this ongoing, the person most knowledgeable at the medical center, who is their risk manager, sat and was asked questions. And during the question they said, show us your policy. What is your policy? As you know, a policy can be written or unwritten. A policy can be demonstrated by actions. And we asked specifically for them to produce their policy on securing sign language interpreters. And what they gave us was a list with a bunch of numbers of places to call for different languages. And handwritten in the corner it said deaf and 711. And we asked what happened when you dialed 711. Well, what happens is it calls the relay service, which doesn't do anything to secure an interpreter. What happened to the state claims from your perspective? From our perspective, the state claims went away because they dismissed all of the, he said dismissed in total. And I don't know what happened to the state claims. I've never been able to adequately ascertain that. So they didn't go back to the state? No. We got nothing that said they went back to the state. So they were presumptively dismissed in the second. They were presumptively dismissed. Very well. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. And the Court will adjourn.
judges: Adelman, O'scannlain, Murguia